## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| | **NO. 24-389** |
| **v.** | |
| **CARLOS SACANELL** | |

### OPINION

Defendant Carlos Sacanell is charged by Grand Jury Indictment with one count of insider trading, in violation of 15 U.S.C. § 78j(b), § 78j(ff), 17 C.F.R. § 240.10b5, and § 240.10b5-2, as well as one count of making a false statement to a federal agency, in violation of 18 U.S.C. § 1001.  He now moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), to dismiss both charges against him on the grounds that the Indictment "fail[s] to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  Specifically, Sacanell argues that the insider trading crime with which he is charged is based on a regulation that violates the Administrative Procedure Act ("APA") and the Constitution, and that the false statement charge cannot be brought in the absence of a separate, lawful prosecution against him.  For the reasons set forth below, Sacanell's Motion will be denied.

### I.    FACTUAL BACKGROUND

Sacanell is charged with insider trading and making a false statement to a federal agency. The Grand Jury Indictment alleges that Sacanell was in a domestic relationship with Person #1, who was employed by Oak Street Health, Inc. ("Oak Street") as an executive.  Around September of 2022, CVS Health Corp. ("CVS") expressed an interest in acquiring Oak Street. Oak Street disclosed details of the potential acquisition to its employees, including Person #1, with the caveat that the information was strictly confidential.  Person #1 told Sacanell about the

acquisition anyway, but advised him that the information was confidential, which Sacanell acknowledged.

The Indictment alleges that Sacanell used his advance knowledge of the acquisition to purchase shares of (and call options on) Oak Street stock, which he sold for a profit of approximately $617,000 after the acquisition was completed in February of 2023.  Later, when agents from the Federal Bureau of Investigation interviewed Sacanell about his trades, according to the Indictment he lied and told them that Person #1 had not shared any material nonpublic information with him concerning the planned acquisition.

## II.    LEGAL STANDARDS

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) permits a defendant to move to dismiss an indictment for "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  As is relevant here, a defendant moving under 12(b)(3)(B) may seek dismissal on "the basis that 'the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'"  *United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013) (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)).

In deciding a motion to dismiss, the Court must accept as true all factual allegations in the indictment.  *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990).  Furthermore, the indictment is "to be read as a whole and interpret[ed] in a common sense manner," *United States v. Lee*, 359 F.3d 194, 209 (3d Cir. 2004) (quotations omitted), and dismissal under Rule 12(b)(3)(B)(v) "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges."  *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000).

## III.    DISCUSSION

Sacanell seeks dismissal of the indictment on three grounds.  First, he argues that one of

the Securities and Exchange Commission ("SEC") regulations he is charged with violating—

namely, Rule 10b5-2[1]—is unlawful because it exceeds the scope of the SEC's rulemaking

authority, as that authority is set forth in § 10(b) of the Exchange Act, which enables the SEC to

promulgate regulations.  Second, he argues that § 10(b) is itself unconstitutional because it

violates the nondelegation doctrine.  Finally, he argues that, in the absence of an otherwise

constitutional prosecution against him, he cannot be lawfully prosecuted for making a false

statement to a federal agency.[2]

Since Sacanell's arguments implicate questions of constitutional magnitude, and since

this prosecution is situated within a somewhat complex statutory and regulatory framework,

some table-setting is in order before turning to the merits of his challenges.

### A.  Background on the Law of Insider Trading

In 1934, Congress passed the Securities Exchange Act ("the Exchange Act"), which set

forth a suite of laws governing securities trading on secondary markets, *see Slack Techs., LLC v.

Pirani*, 598 U.S. 759, 763 (2023), and established the SEC, an executive agency tasked with

"protect[ing] investors in securities markets" by enforcing violations of the Exchange Act.  *Axon

Enter. v. FTC*, 598 U.S. 175, 180 (2023).

Relevant here is § 10(b) of the Exchange Act, which provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means

---

[1] To conform with usage in prior caselaw and in the Parties' briefing, the Court refers to 17 C.F.R. §§ 240.10b-5, 240.10b5-1, and 240.10b5-2 as "Rule 10b5," "Rule 10b5-1," and "Rule 10b5-2" respectively, and to 15 U.S.C. § 78j(b)—which is § 10(b) of the Securities Exchange Act of 1934—as "§ 10(b)."

[2] Defendant also invokes a recent Executive Order decrying overcriminalization in federal regulatory law and directing agencies to take steps to reform the portions of their regulations that carry the potential for criminal penalties.  *See* Exec. Order No. 14294, *Fighting Overcriminalization in Federal Regulations*, 90 Fed. Reg. 20363 (May 14, 2025).  Defendant maintains that this Order speaks to "the exact problem at issue in this case," but he does not explain what force the Order has as a matter of law, or indicate to the Court how the Order is meant to factor into its analysis (if it is at all).  Accordingly, the Order is not considered as an independent argument in favor of dismissal in this case.

or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

§ 10(b) does two things.  First, it enables the SEC to implement "such rules and regulations as [it] may prescribe as necessary or appropriate in the public interest or for the protection of investors" to combat the use of "manipulative or deceptive" trading schemes.  *Id.* Second, it makes it illegal to violate those "rules and regulations."  *Id.*  Among the rules that the SEC has promulgated under the auspices of § 10(b) is Rule 10b5.  That rule, mirroring the language of § 10(b) itself, makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Insider trading has been consistently recognized by the Supreme Court as a violation of § 10(b) and Rule 10b5.  *See, e.g., Chiarella v. United States*, 445 U.S. 222 (1980); *Dirks v. SEC*, 463 U.S. 646 (1983).  In *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997), the Supreme Court approved of two distinct theories of liability for insider trading—the "traditional" and "misappropriation" theories—and explained how each one constitutes a violation of § 10(b) and Rule 10b5.

"Traditional" insider trading is "when a corporate insider trades in the securities of his

corporation on the basis of material, nonpublic information." *Id.* "Such trading constitutes a deceptive device under § 10(b) because the insider violates a 'relationship of trust and confidence' with his shareholders by trading on nonpublic information learned as a company insider. The insider's position imposes a duty to either abstain from trading or disclose the inside information to the investors with whom he trades." *United States v. McGee*, 763 F.3d 304, 310-11 (3d Cir. 2014) (citing *Chiarella*, 445 U.S. at 228).

Insider trading through "misappropriation," by contrast, is when a person, who otherwise owes no duty to *shareholders*, "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the *source* of the information." *O'Hagan*, 521 U.S. at 652 (emphasis added). This kind of trading is "deceptive," and thus actionable under § 10(b), only when the trader fails to disclose their intent to trade to the source of the insider information. *McGee*, 763 F.3d at 311. By withholding that fact, the trader breaches a duty to honor the "relationship of trust and confidence" they enjoy with the source. *Id.* (citing *Chiarella*, 445 U.S. at 233). In this sense, "[d]eception through nondisclosure . . . is the crux of insider trading liability" under both theories. *Id.*

Take this case as an example—it is a misappropriation case. The Government alleges that Sacanell and Person #1 shared a relationship of trust and confidence. When Person #1 shared confidential information about the Oak Street acquisition with Sacanell, he had a duty to disclose to Person #1 his intent to trade Oak Street stock on the back of that information. In failing to do so, he employed a deceptive device—*i.e.*, his silence with respect to his intent to trade—in connection with a securities transaction, and thus violated § 10(b) and Rule 10b5.

Sacanell argues—separately from his constitutional arguments discussed later on—that the Supreme Court in *O'Hagan* only blessed application of the misappropriation theory to cases

where the trader had a fiduciary relationship with the party that shared the information.  While it is true that the defendant in *O'Hagan* (a lawyer) did in fact owe a fiduciary duty to the parties sharing the information (his law firm and its client), the Supreme Court did not cabin the reach of misappropriation liability to cases where the trader is a fiduciary, but rather extended liability to all "those who breach a recognized duty."  *O'Hagan*, 521 U.S. at 645, 666.  In fact, the Third Circuit has already rejected Sacanell's exact argument on this point, describing the *O'Hagan* Court as "paint[ing] with a broad[] brush" by "referring to the requisite relationship" in more expansive terms like "a 'fiduciary or other similar relationship,' an 'agency or other fiduciary relationship,' a 'duty of loyalty and confidentiality,' and a 'duty of trust and confidence.'" *McGee*, 763 F.3d at 314 (quoting *O'Hagan*, 521 U.S. at 652-61); *see also United States v. McPhail*, 831 F.3d 1, 4 (1st Cir. 2016) ("In *O'Hagan* . . . [the Supreme Court] opened the door to circumstances in which an expectation of trust and a reliance on discretion arises outside of a traditional fiduciary setting.").

However, if *O'Hagan* did not limit misappropriation liability to fiduciaries, neither did it dictate which nonfiduciary relationships could ground such liability.  *McGee*, 763 F.3d at 311 (citing *SEC v. Yun*, 327 F.3d 1263, 1271 (11th Cir. 2003)).  In response to this uncertainty, the SEC promulgated two regulations meant to "clarify and enhance" the misappropriation theory of insider trading liability.  Proposed Rule, *Selective Disclosure and Insider Trading*, 64 Fed. Reg. 72,590 (proposed Dec. 28, 1999) ("the Proposed Rule").  These regulations are Rules 10b5-1 and 10b5-2, and the latter is centrally at issue in this case.

Rule 10b5-1 codifies the traditional and misappropriation theories of insider trading liability.  It provides that:

> [t]he "manipulative or deceptive device[s] or contrivance[s]" prohibited by [§ 10(b)] and [Rule 10b-5] include, among other things, the purchase or sale of a

security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

17 C.F.R. § 240.10b5-1.

Rule 10b5-2, then, goes on to provide three "non-exclusive definition[s] of circumstances in which a person has a duty of trust or confidence for purposes of the 'misappropriation' theory . . . ." Preliminary Note to 17 C.F.R. § 240.10b5-2. Subsection (b)(1) provides that a duty of trust or confidence exists when "a person agrees to maintain information in confidence." 17 C.F.R. § 240.10b5-2(b)(1). Subsection (b)(2) provides that the same duty exists "[w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality." 17 C.F.R. § 240.10b5-2(b)(2). Finally, subsection (b)(3) provides that the duty exists "[w]henever a person receives or obtains material nonpublic information from his or her spouse, parent, child, or sibling" and does not demonstrate both that they "neither knew nor reasonably should have known that the person who was the source of the information expected that the person would keep the information confidential" and that "there was no agreement or understanding to maintain the confidentiality of the information." 17 C.F.R. § 240.10b5-2(b)(3).

It is against this backdrop of regulations and caselaw that the Government brings this insider trading prosecution against Sacanell. As mentioned previously, this is a misappropriation case premised upon a non-fiduciary relationship between Sacanell and Person #1, his source for the confidential information. Specifically, the Government alleges that Sacanell has violated §

10(b), Rule 10b5, and Rule 10b5-2 by trading Oak Street stock based on material, nonpublic information he received from Person #1 and without disclosing to Person #1 his intent to trade, thus violating a duty of trust or confidence owed to her.

The Government has not specified, however, which subsection of Rule 10b5-2 it relies upon in its prosecution of Sacanell; for this reason, it is not clear which of the three relationships of "trust or confidence" set forth in that Rule the Government is relying on here.  The Indictment, for its part, alleges that Sacanell owed "duties of trust and confidence" to Person #1 for at least three reasons: (1) because he was "her domestic partner;" (2) because he "knew that Person #1 expected that [he] would maintain the confidentiality" of the information shared with him; and, (3) because he "acknowledged the need to keep the information confidential."  These facts could ground a prosecution under subsections (b)(1) and (b)(2), and arguably under (b)(3) as well.

The question of which subsection the Government relies upon matters because, in *McGee*, the Third Circuit already rejected an argument similar to Sacanell's—namely, that subsection (b)(2) of Rule 10b5-2 exceeded the scope of the SEC's rulemaking authority.  763 F.3d at 316.  In that case, since the defendant had been convicted only under subsection (b)(2), the Third Circuit chose to "discuss solely that portion of the rule," *id.* at 312, and appeared to limit its holding accordingly.  *See id.* at 316 ("We hold that Rule 10b5-2(b)(2) is a valid exercise of the SEC's rulemaking authority.").  If the Government proceeds under this subsection, then, any challenge to subsection (b)(2) is doomed from the start.

Besides the ambiguity about which subsection of Rule 10b5-2 the Government is pressing here, Sacanell calls attention to another wrinkle that muddies *McGee*'s applicability to this case.  The *McGee* Court applied *Chevron* deference in upholding Rule 10b5-2(b)(2), *see id.*

at 312-16—but, as Sacanell points out, *Chevron* deference was recently abandoned by the Supreme Court in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  Sacanell argues that *McGee* is the only case precedential here blessing Rule 10b5-2 as a valid exercise of the SEC's rulemaking power, and that, since that case "has essentially been overruled" by *Loper Bright*, the Court must address the challenge afresh—this time, without affording the SEC the deference it may previously have been owed under *Chevron*.  His argument is that, when looked at with clear eyes, Rule 10b5-2 is too vague and wide-reaching to be considered a lawful exercise of the SEC's rulemaking power.  Separately, he also argues that § 10(b) is itself unconstitutional because it delegates Congress's power to write criminal laws to the SEC.

As the following discussion reveals, Sacanell is wrong on all fronts.  To the extent the Government prosecutes Sacanell under Subsection (b)(2) of Rule 10b5-2, then Sacanell's challenge is foreclosed by *McGee*.  If, on the other hand, the Government relies on a different theory of liability under Rule 10b5-2, then Sacanell's challenge fails even under the less deferential test set forth by the Supreme Court in *Loper Bright*.

### B.  With Respect to Rule 10b5-2(b)(2), *McGee* Binds this Court

In *McGee*, the Third Circuit held "that Rule 10b5-2(b)(2) is a valid exercise of the SEC's rulemaking authority."  763 F.3d at 316.  In reaching that holding, it "review[ed] the validity of Rule 10b5-2(b)(2) under the familiar"—though now defunct—"two-step *Chevron* deference framework."  *Id*. at 312.  At step one of that framework, a Court asks if "the [enabling] statute is silent or ambiguous" on "the precise question at issue."  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  If the answer is 'yes,' then the Court must uphold the rule if it is "based on a permissible construction of the statute."  *Id*.

At step one, the *McGee* Court found that § 10(b) was ambiguous as to the precise

question at issue—namely, whether the misappropriation theory of insider trading could be based on a non-fiduciary duty—"because § 10(b) does not mention insider trading at all, much less misappropriation or relationships required for liability." 763 F.3d at 313. Then, at step two, the Court determined that "'the [SEC's] interpretation [of § 10(b)] is reasonable in light of the language, policies, and legislative history' of § 10(b) and the Exchange Act of 1934 as a whole." *Id.* at 315 (quoting *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 522 (3d Cir. 2013)). The Court noted that the SEC undertook a "'thorough and careful consideration . . . of the ends of § 10(b), the state of the current insider trading case law' and 'the need to protect investors and the market'" in passing Rule 10b5-2(b)(2), and although the Court was "not without reservations concerning the breadth of misappropriation" reached by the Rule's language, it nonetheless concluded that the Rule was "based on a permissible reading of § 10(b)" and was therefore entitled to *Chevron* deference. *Id.* at 315-16.

McGee is a *Chevron* opinion through and through. So, what happens to it given the Supreme Court's about-face on *Chevron*? To phrase the question differently: after *Loper Bright*, is a District Court still bound by the holdings of an opinion from its Court of Appeals that, like *McGee*, relied on *Chevron* deference? The answer, at least with regard to *McGee* and Rule 10b5(b)(2), is yes.

It is patent, as a first principle, that a district court is bound to apply its appellate court's precedent. *See Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 867 (3d Cir. 1984). This rule, though often treated as a given, is far from banal. In reality, it is one of only a handful of pillars supporting the hierarchical structure of the federal judiciary. *See id.* ("If the judges of this court are bound by earlier panels, *a fortiori* district court judges are similarly bound. Recognition of the hierarchical nature of the federal judiciary requires no less.").

Because it is so fundamental, deviance from this tenet is justified only in a narrow band of cases. As Judge Robreno of the Eastern District of Pennsylvania put the matter, "[u]nder the allocation of authority established by the three-tier system of federal courts, this Court is obliged to follow Third Circuit precedent unless that precedent has been overruled by the [C]ourt of [A]ppeals sitting [e]n banc or by an opinion of the Supreme Court that overrules the precedent." *Loftus v. SEPTA*, 843 F. Supp. 981, 984 (E.D. Pa. 1994) (cleaned up); *see also Hammond v. Commonwealth Mortgage Co. of Am., L.P.*, 156 Bankr. 943, 947-48 (E.D. Pa. 1993) (collecting cases). Other District Courts in this Circuit have further found that deviation from Third Circuit authority is warranted in a distinct but related situation: when the Supreme Court "has rendered a decision that is necessarily inconsistent" with the Circuit authority in question. *Fenza's Auto, Inc. v. Montagnaro's, Inc.*, 2011 WL 1098993, at *7 (D.N.J. Mar. 21, 2011) (citing *Finch v. Hercules, Inc.*, 865 F.Supp. 1104, 1121 (D. Del. 1994)). Under these frameworks, then, the questions are whether *Loper Bright* "overrules" *McGee* or is "necessarily inconsistent" with it.

In terms of the substantive law at issue in each case, it is worth noting that *Loper Bright* and *McGee* involve entirely different fact patterns and realms of regulation. *McGee*, as described previously, involved an SEC regulation codifying liability for insider trading by misappropriation of material nonpublic information in violation of a non-fiduciary duty. 763 F.3d at 316. *Loper Bright*, by contrast, involved a National Marine Fisheries Service regulation that required certain fishing boats to pay for a third-party observer to ride onboard and monitor the vessel and its crew. 603 U.S. at 382. What's more, the Court in *Loper Bright* did not even rule on whether that regulation was lawful or not. *Id.* at 413. So, it is pellucid that *Loper Bright* did not overrule *McGee* by explicitly invalidating the SEC rule at issue in the latter case.

Sacanell argues, nonetheless, that *Loper Bright* "effectively overruled" *McGee* by

eliminat[ing] *Chevron* deference." But in *Loper Bright*, the Court took pains to specifically forswear the overruling of anything other than the analytical framework passed down in *Chevron*:

> [W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology.

603 U.S. at 412. This proviso settles the question of whether *Loper Bright* overruled *McGee* simply by virtue of *McGee* having applied *Chevron* deference—it did not. If *Loper Bright* did not even overrule the substantive holding of *Chevron* itself, then it certainly did not overrule *McGee*'s holding that § 10b5-2(b)(2) is lawful.

This same proviso is relevant to the question of whether *Loper Bright* is "necessarily inconsistent" with *McGee*. *Fenza's Auto*, 2011 WL 1098993, at *7. As the foregoing excerpt shows, in deciding *Loper Bright* in the manner that it did, the Supreme Court blessed a state of affairs wherein cases that relied on *Chevron* deference remain good law, even while *Chevron* deference itself has been abandoned going forward. To argue, as Sacanell does here, that *Loper Bright* and *McGee* are "necessarily inconsistent" simply because the latter applied an analytical framework denounced by the former amounts to little more than "an argument that [*McGee*] was wrongly decided." *Loper Bright*, 603 U.S. at 412. That has never been a valid reason for a District Court to disavow binding Circuit precedent in the past, and it certainly is not here. *See id.*; *Poulis*, 747 F.2d at 867.

These conclusions are also consistent with the Supreme Court's admonition to the Courts of Appeals that, "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of

overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).  Although this rule does not explicitly direct District Courts to behave similarly when binding Circuit precedent "appears to rest on reasons rejected" by a subsequent Supreme Court case, "the structure of the Congressionally created inferior Article III courts counsels" against "'underrul[ing]' established circuit court precedent" by acting against that admonition. *Johnson v. City of Detroit*, 319 F. Supp.2d 756, 771 n.8 (E.D. Mich. 2004).

Sacanell also argues that the Third Circuit's recent decision in *United States v. Barkers-Woode*, 136 F.4th 496 (3d Cir. 2025) compels this Court to set aside *McGee* in light of *Loper Bright*.  In that case, the Third Circuit reviewed the application of a two-point sentencing enhancement based on the number of people victimized by an identity theft scheme.  *Id.* at 500. Consistent with the plain meaning of the word "victim," the District Court counted, among the "victims" of the identity theft scheme, any individual whose identity was stolen by the defendants.  *Id.* at 501.  The District Court adopted this plain-language reading of the sentencing guideline at issue despite an earlier Third Circuit case, *United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009), in which the Court of Appeals held that the term "victim" did not include individuals whose identities were stolen but who suffered no pecuniary harm as a result of the theft.  *Id.*  The Third Circuit in *Kennedy* landed on that interpretation, even though it contradicted the plain meaning of the word "victim," because it was bound to give deference to the Sentencing Commissions' Application Notes, which Notes suggested that the more restrictive definition of "victim" was intended by the Sentencing Commission.  *Id.*; *see also id.* at 422 ("[O]ur task is to adhere to the Guidelines and its Application Notes.").

In *Barkers-Woode*, the Third Circuit explained why *Kennedy* no longer controlled the District Court.  136 F.4th at 501.  First, by the time of the District Court's ruling, the Supreme

Court had, in *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019), already ended the regime of deference to agency interpretations that the Third Circuit relied upon in *Kennedy*—called, alternately, *Auer* or *Seminole Rock* deference.  *Id.*  Second, after and in response to *Kisor*, the Third Circuit effectively overruled *Kennedy* through its *en banc* decision in *United States v. Malik Nasir*, 17 F.4th 459, 471 (3d Cir. 2021), where it held that the Sentencing Commission's commentary to its Guidelines was no longer entitled to deference in all cases.  *Id.*

        In the case at bar, the second of these two equally crucial propositions is missing.  Yes, the Supreme Court has ended *Chevron* deference in *Loper-Bright*, just as it ended *Auer* deference in *Kisor*.  But the Third Circuit has not, in an *en banc* opinion or otherwise, overruled *McGee*, or even applied *Loper-Bright* in a factually or legally comparable context.  In *Barkers-Woode*, the Third Circuit had already effectively overruled *Kennedy* in an *en banc* opinion; so, the District Court was not bound by *Kennedy*.  136 F.4th at 501.  In the absence of a decision from the Third Circuit indicating that *McGee* is no longer good law, this Court will not "underrule" the Court of Appeals by holding so here.  *City of Detroit*, 319 F. Supp.2d at 771 n.8.

        For all of these reasons, *McGee* still binds this Court.  Accordingly, Defendant's bid to dismiss any § 10b5-2(b)(2) charge as exceeding the SEC's statutory authority fails as contrary to precedent.

## C.  Rule 10b5-2 is Lawful Under *Loper Bright*

        Even if *McGee* did not bind this Court—or, as may prove relevant here, if the Government prosecutes Sacanell under subsection (b)(1) or (b)(3)—all subsections of Rule 10b5-2 are still lawful regulations under the standard set forth in *Loper Bright*.  In that case, the Supreme Court differentiated between two types of agency enabling statutes: those that, by their plain text, "authorize[]" an agency "to exercise a degree of discretion," and those that do not.

14

*See* 603 U.S. at 394-95.

§ 10(b) of the Exchange Act—the enabling statute at issue here—is an example of a discretion-delegating statute. The statute reads, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance *in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.*

15 U.S.C. § 78j(b) (emphasis added). The italicized portion of § 10(b) plainly delegates discretion to the SEC; as the Third Circuit has previously described it, that part of the statute is "a catch-all provision [that] authorizes the SEC to 'prescribe [regulations] as necessary or appropriate' to prevent the use of 'manipulative or deceptive device[s]' in connection with trading securities." *McGee*, 763 F.3d at 313.

When determining the lawfulness of a regulation passed in exercise of this kind of statutorily-granted discretion, the Court in *Loper Bright* explained that "the role of the reviewing court . . . is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." 603 U.S. at 395. The analytical framework for that review requires: (1) "recognizing constitutional delegations; (2) "fixing the boundaries of the delegated authority," and, (3) "ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

### i.    *§ 10(b)'s Delegation of Discretion is Constitutional*

Since § 10(b) delegates discretion to the SEC to "fill up the details" of the Exchange Act's prohibition on deceptive trading practices, *Wayman v. Southard*, 23 U.S. 1, 43 (1825), the first question, under the three-part framework set forth by the Supreme Court in *Loper Bright*, is whether this delegation is a constitutional one.

15

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States . . . ."  U.S. Const. art. I, § 1.  "Accompanying that assignment of power to Congress is a bar on its further delegation.  Congress . . . may not transfer to another branch 'powers which are strictly and exclusively legislative.'"  *Gundy v. United States*, 588 U.S. 128, 135 (2019) (quoting *Wayman*, 23 U.S. at 42).  Collectively, these separation-of-powers principles underly what has become known as the nondelegation doctrine. *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  The purpose of that doctrine is to separate constitutional delegations—whereby Congress "obtain[s] the assistance of its coordinate Branches" in order to effectively "implement and enforce the laws," *Gundy*, (citing *Mistretta*, 488 U.S. at 372)—from unconstitutional abdications of "powers which are strictly and exclusively legislative" in nature.  *Wayman*, 23 U.S. at 42.

To distinguish between lawful and unlawful delegations, the Supreme Court has consistently directed courts to ask whether, in drafting the statute at issue, Congress has set forth "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform."  *Mistretta*, 488 U.S. at 372 (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928) (brackets in original)); *see also FCC v. Consumers' Rsch.*, 606 U.S. __ (2025), slip op. at 11 (reaffirming the "intelligible principle" test).  This inquiry is "not demanding," and is satisfied when "Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" *Gundy*, 588 U.S. at 146 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

"[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation," since it "requires construing the challenged statute to figure out what task it delegates and what instructions it provides."  *Id.* at 135-36.  Sacanell argues that the text of

§ 10(b) "does not provide any intelligible principle for determining whether an SEC regulation is appropriate." The Court must turn, then, to the statute to determine if he is right.

> § 10(b) provides that:
>
> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Contrary to Sacanell's position, an intelligible principle is readily gleaned from the statute's text—namely, that the SEC may enact "such rules and regulations" prohibiting the "use or employ[ment], in connection with the purchase or sale of any security," of "any manipulative or deceptive device or contrivance" as the agency deems "necessary or appropriate in the public interest or for the protection of investors." *Id.* This directive is a lawful delegation because it sets forth the general policy the SEC must pursue—*i.e.*, that the regulations protect investors and serve the public interest—and establishes the boundaries of its authority—*i.e.*, that the regulations only reach the "use or employ[ment], in connection with the purchase or sale of any security," of "any manipulative or deceptive device or contrivance." *Id.*

Many similar statutory delegations have been upheld as constitutional in the past, including delegations that instruct regulators: to regulate in the "public interest," *see, e.g., Nat'l Broadcast Co. v. United States*, 319 U.S. 190, 225-26 (1943); to set "just and reasonable" natural gas rates, *see Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944); to prohibit corporate structures that "unfairly or inequitably distribute voting power among security holders," *see Am. Power & Light*, 329 U.S. at 104-106; and, to set air quality standards "requisite to protect the public health," *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001), among many others. *Cf. Gundy*, 588 U.S. at 130 ("Only twice in this country's history . . . have

17

we found a delegation excessive—in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion.'" (quoting *Mistretta*, 488 U.S. at 373 n.3) (emphasis in original)).

Since § 10(b) indicates to the SEC's "the general policy" it must pursue and defines the "boundaries of [its] authority," *Am. Power & Light*, 329 U.S. at 105, it contains "an intelligible principle" by which the SEC "is directed to conform" its regulations. *J. W. Hampton*, 276 U.S. at 409. Accordingly, § 10(b) is a constitutional delegation of Congress's power, and the first step of the Supreme Court's *Loper Bright* test is satisfied.

### ii.    *Rule 10b5-2 Falls Within § 10(b)'s Delegation of Power*

The second and third steps of the Supreme Court's test in *Loper Bright* require a court to "fix[] the boundaries of the delegated authority" and "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries." *Loper Bright*, 603 U.S. at 395. The "boundaries of the delegated authority," *id.*, have already been limned in the preceding section: § 10(b) permits the SEC to enact "such rules and regulations" prohibiting the "use or employ[ment], in connection with the purchase or sale of any security," of "any manipulative or deceptive device or contrivance" as the agency deems "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The only remaining question, then, is whether the SEC "has engaged in reasoned decisionmaking within those boundaries" in promulgating Rule 10b5-2. 603 U.S. at 395; *see also Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (explaining that, under the APA, federal agencies like the SEC must engage in "reasoned decisionmaking" when passing regulations (citation omitted)). In order to engage in reasoned decisionmaking, the agency must engage in a process whereby the regulations it promulgates are "logical and rational," *id.*, and rest "on a consideration

18

of . . . relevant factors."  *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

§ 10(b) was enacted "to insure the maintenance of fair and honest markets in [securities] transactions," and was purposefully drafted in order to outlaw "any . . . manipulative or deceptive practices which [the SEC] finds detrimental to the interests of the investor."  *McGee*, 763 F.3d at 315 (quoting 15 U.S.C. § 78b; S. Rep. No. 73-792, at 18 (1934)).  Rule 10b5-2, in turn, was passed to ensure that the SEC was able to prosecute a set of such "deceptive practices . . . detrimental to the interests of the investor," *id.*—namely, insider trading cases where material nonpublic information was disclosed to "friends or family members of insiders" and subsequently traded on.  Proposed Rule, 64 Fed. Reg. at 72,602.  In proposing the Rule, the SEC reasoned that this kind of insider trading, which "'stems from contrivance, not luck,'" and relies upon an "informational disadvantage to other investors . . . harms investor confidence in the integrity and fairness of the nation's securities markets" and discourages market participation because it "'cannot be overcome with research or skill.'"  *Id.* at 72,603 (quoting *O'Hagan*, 521 U.S. at 658-59).

As this history shows, the purpose and substance of the Rule falls squarely within § 10(b)'s grant of discretionary power, since it targets a "manipulative or deceptive" trading practice that the SEC deemed harmful to investors and to the public interest.  15 U.S.C. § 78j(b); *see United States v. Corbin*, 729 F. Supp. 2d 607, 619 (S.D.N.Y. 2010) (finding that the passage of Rule 10b5-2 "was buttressed by a thorough and careful consideration—one that far surpasses mere reasonableness—of the ends of § 10(b), the state of the current insider trading case law . . . and the need to protect investors and the market generally"); *McGee*, 763 F.3d at 315-16 (agreeing with *Corbin* and concluding that Rule 10b5-2(b)(2) is "'well tuned to an animating

purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence'" (quoting *O'Hagan*, 521 U.S. at 658)).  Sacanell gives the Court no reason to conclude that Rule 10b5-2 was the result of anything other than reasoned decisionmaking; accordingly, the third step of the Supreme Court's test in *Loper Bright* is satisfied, 603 U.S. at 395, and the Rule is a lawful exercise of the SEC's rulemaking power

### iii.    The Rule of Lenity Does Not Apply

Throughout his briefs, Sacanell argues that the rule of lenity demands the dismissal of the insider trading charge brought against him.  The rule of lenity stands for the proposition that, "[i]f a federal criminal statute is grievously ambiguous, then the statute should be interpreted in the criminal defendant's favor." *Wooden v. United States*, 595 U.S. 360, 377 (2022) (citation omitted) (Kavanaugh, J., concurring).  Crucially, however, "the rule of lenity does not apply when a law merely contains *some* ambiguity or is difficult to decipher." *Id.* (emphasis added). Rather, it "applies only when[,] 'after seizing everything from which aid can be derived,' the statute is still grievously ambiguous." *Id.*  (quoting *Muscarello v. United States*, 524 U.S. 125, 138-139 (1998)).  "Properly applied," then, the rule "rarely if ever plays a role," *id.*, since "a reviewing court . . . will almost always reach a conclusion about the best interpretation of the [law] at issue." *Kisor*, 588 U.S. at 632 (Kavanaugh, J., concurring).

That is precisely the case here.  Although Rule 10b5-2 does not answer every question a prospective trader may have about what is legal and what is not, it is not "grievously ambiguous"—*i.e.*, so undecipherable that a court cannot "reach a conclusion about [its] best interpretation . . . ." *Id.*  Instead, as the foregoing sections show, the scope and impact of Rule 10b5-2 are readily discernible after reading its plain text and considering the backdrop against which it was enacted. *See Salman v. United States*, 580 U.S. 39, 51 (2016) (rejecting rule of

lenity challenge to § 10(b)).  Sacanell's invitation to dismiss the insider trading charge in observance of the rule of lenity is therefore declined.  *Cf. Callanan v. United States*, 364 U.S. 587, 596 (1961) ("The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers").

### D.  The False Statement Charge May Remain

Finally, Sacanell argues that, if the insider trading charge is dismissed, so too should the charge of making a false statement to a federal agency in violation of 18 U.S.C. § 1001.  Since the insider trading charge will not be dismissed, his argument that the false statement charge should be dismissed carries no weight.

### IV.   CONCLUSION

For the foregoing reasons, Defendant Carlos Sacanell's Motion to Dismiss the Grand Jury Indictment shall be denied.

An appropriate order follows.

**BY THE COURT:**


**S/ WENDY BEETLESTONE**

**_____**

**WENDY BEETLESTONE, J.**

21