IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-389 |
| CARLOS SACANELL | : | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

In early 2023, defendant Carlos Sacanell made over $600,000 in the span of weeks by repeatedly using inside information that he misappropriated from his domestic partner about CVS Health Corp.'s acquisition of Oak Street Health, Inc.  The defendant was an active stock trader but had never traded in the shares of Oak Street Health, where his domestic partner worked.  Yet in the weeks before the CVS-Oak Street Health transaction was publicly announced, from January 11, 2023 to February 3, 2023, the defendant amassed significant quantities of Oak Street Health shares and call options (which are valuable if a stock price increases before the option expires) based on the material, non-public information he obtained from his partner about the planned transaction.  Indeed, on February 3, 2023—after being told the transaction was going to be announced publicly on February 8, 2023—the defendant purchased approximately 17,300 shares of Oak Street Health stock and acquired more Oak Street Health options than any other individual or entity, including institutional investors, did on that day (specifically, 950 call options).  The defendant concealed his trading from his domestic partner, and when the FBI questioned the defendant about his trading on April 3, 2024, he falsely told agents that his partner did not provide him any information about the CVS-Oak Street Health transaction.

For these reasons described below, the government recommends a sentence of incarceration near the low end of the 24- to 30-month advisory guidelines range, absent any basis for a departure addressed in the supplemental sealed attachment to this sentencing memorandum. The government also requests that the Court impose at least two years of supervised release and, as previously ordered by the Court, a forfeiture money of judgment of $617,000.   (ECF No. 43.)

I.      **PROCEDURAL HISTORY**

On October 31, 2024, a grand jury in this district returned a two-count Indictment charging the defendant with one count of securities fraud, in violation of 15 U.S.C. § 78j(b), 78ff and 17 C.F.R. § 240.10b5, 10b5-2, and one count of making a false statement to a federal agency, in violation of 18 U.S.C. § 1001.   (ECF No. 1.)   On July 11, 2025, the Court denied the defendant's motion to dismiss the indictment based on constitutional grounds.   (ECF Nos. 19, 26, 27.)   On September 3, 2025, the defendant pled guilty to both counts pursuant to a plea agreement, which allows the defendant to appeal the Court's denial of his motion to dismiss. (ECF No. 33.)

II.     **SENTENCING CALCULATION**

A.  **Statutory Maximum Sentences**

The statutory maximum penalties for Count One (securities fraud – insider trading) are 20 years' imprisonment, a 3-year period of supervised release, a $5,000,000 fine, and a $100 special assessment, and for Count Two (making a false statement to a federal agency), 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.   The total maximum sentence is 25 years' imprisonment, a 3-year period of supervised release, $5,250,000 fine, and a $200 special assessment.

**B. <u>Sentencing Guidelines Calculation</u>**

The PSR correctly calculates the defendant's applicable advisory guideline range as 24 to 30 months' imprisonment (total offense level 17 and criminal history category I).

The Probation Office calculated the defendant's offense level as follows:

- The base offense level offense is 8 (USSG § 2B1.4(a)).
- 14 points are added because of a gain between $550,000 and $1.5 million (USSG § 2B1.4(b)(1)).
- 3 points are subtracted for acceptance of responsibility and timely plea (USSG § 3E1.1).
- 2 points are subtracted due to the defendant having 0 criminal history points (USSG § 4C1.1).

**C. <u>Analysis of 18 U.S.C. § 3553(a) Factors</u>**

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. This Court must also consider all of the sentencing considerations set forth in Section 3553. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or

vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553.  The relevant § 3553 factors will be discussed in turn.

     1.   The Nature and Circumstances of the Offense

This case involves very serious and brazen criminal conduct.  The defendant leveraged his long-term relationship with his domestic partner to obtain material, non-public information about CVS's planned acquisition of Oak Street Health and secretly traded on the basis of that information.  This resulted in him obtaining profits of approximately $617,000.

This was not a one-time transgression.  Rather, over a four-week period, the defendant regularly received information about the planned transaction and traded accordingly—that is, (i) when he received information indicating that the transaction was going to happen, he bought Oak Street Health shares and call options in an attempt to cash in on the resulting increase on Oak Street Health's stock price; and (ii) when he received information suggesting the deal was going to be put on pause, he sold shares in an attempt to mitigate his losses.  This pattern of trading was summarized as follows in the government's plea memorandum:

- After receiving from Person #1 the material, nonpublic information regarding the existence of the acquisition and its projected announcement date of January 23, 2023, from January 11, 2023 to January 20, 2023, the defendant purchased approximately 28,580 shares of Oak Street Health stock and 192 call option contracts in Oak Street Health stock, with expiration dates of February 17, 2023.

- The January 23, 2023 announcement did not occur, however, as CVS and Oak Street Health agreed to pause and potentially resume their negotiations after the Centers for Medicare & Medicaid Services issued the Medicare Advantage Risk Adjustment Data Validation Program Final Rule (the "RADV Final Rule") on or about February 1, 2023.  On or about January 20, 2023, Person #1 learned about this information, which was not known to the public, and told the defendant in confidence.  After receiving from Person #1 material, nonpublic information that the transaction was no longer going to be announced on or about January 23, 2023 and the pause in negotiations pending issuance of the RADV Final Rule, from on or about January 23, 2023 to on or about January 24, 2023, the defendant sold approximately 24,200 shares of Oak Street Health stock.

- The RADV Final Rule was issued on February 1, 2023.  On that day, the defendant sent a text message to Person #1 seeking information regarding the affect the rule had on the CVS-Oak Street Health transaction, stating: "OSH is crashing today [ . . . ]  I guess bad news??"  Person #1 responded that the "ruling"—a reference to the RADV Final Rule, which they had previously discussed—"was not as harsh as it might have been" and explained to the defendant that all health care stocks were down because of an issue regarding Medicare Advantage plans.  Starting approximately seven minutes after receiving from Person #1 this material, nonpublic information, on February 1, 2023, the defendant purchased approximately 5,000 shares of Oak Street Health stock and approximately 130 call option contracts in Oak Street Health, with expiration dates of February 17, 2023.

- On the evening of February 2, 2023, Person #1 received an email from an executive at Oak Street Health stating that "[i]t is looking likely our potential partnership with CVS is going to come to fruition and will be announced the morning of Wednesday 2/8." The defendant learned this information, which was not known to the public, from Person #1, who trusted that the defendant would keep the information confidential. On February 3, 2023, the defendant purchased approximately 17,300 shares of Oak Street Health stock and approximately 950 call option contracts in Oak Street Health, with expiration dates of February 17, 2023. On February 3, 2023, the defendant traded more option contracts in Oak Street Health than any other individual or entity, including institutional investors, did on that day.

In sum, the defendant amassed significant quantities of Oak Street Health stock (28,580 shares and 192 call options) when he first received good news about the deal, sold stock (24,200 shares) when learning the deal was being put on pause, and bought more stock (22,300 shares and 1080 call options) after receiving news that the deal was going forward.

The defendant engaged in this trading despite knowing that he and his domestic partner had a longstanding understanding that of confidentiality regarding information that Person #1 provided to the defendant regarding Oak Street Health. The defendant acknowledged this understanding in contemporaneous text messages, when he advised his domestic partner not to disclose to co-workers information about the transaction. He was similarly dishonest with the FBI agents when he was questioned regarding his suspicious trading in Oak Street Health, as he falsely told the agents that his domestic partner did not provide him information regarding CVS's

planned acquisition of Oak Street Health before the acquisition was publicly announced on February 8, 2023.

    2.   <u>The History and Characteristics of the Defendant</u>

The defendant has worked as chemist or scientist for most of his adult life. (PSR ¶¶ 70–74.) He does not have any prior criminal history. This is accounted for in the guidelines range, because he is in the lowest criminal history category and receives the two-level reduction in his offense level for a zero-point offender. (PSR ¶ 37.)

The defendant accepted guilt relatively early in this case. Within a week after his phone was seized by the FBI pursuant to a search warrant, the defendant retained counsel and was in communication with the government. After the indictment was returned, the defendant moved to dismiss the indictment based purely on legal grounds but otherwise did not file any other substantive motions. He entered into a plea agreement in early August 2025, shortly after the Court denied his motion to dismiss and several months before the October 2025 trial date. As a result, the Court did not need to preside over what would have been a complicated trial or rule on any trial-related motions. The defendant has also paid $100,000 towards the $617,000 forfeiture money judgment.

    3.   <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense</u>

There is a strong need for the Court's sentence to promote respect for the law, reflect the seriousness of the offense, and provide just punishment for the offense. As the Court can see, insider trading can be very lucrative: with just a few clicks of a mouse, an individual who wrongfully uses material, non-public information can make trades that will result in significant monetary gains or avoid significant losses. Indeed, the defendant's unlawful trading over a

four-week period resulted in a profit of approximately $617,000.   As the Third Circuit has stated, a "trader's undisclosed, self-serving use" of confidential information harms the investing public since it "chills market participation because it 'stems from contrivance, not luck' and the informational disadvantage to other investors 'cannot be overcome with research or skill.'" *United States v. McGee*, 763 F.3d 304, 315–16 (3d Cir. 2014) (quoting Proposed Rule, *Selective Disclosure and Insider Trading*, 64 Fed. Reg. 72590 (Dec. 28, 1999), *available at* 1999 WL 1255550).   A sentence of incarceration would send the appropriate message that insider trading is a serious offense that enriches those who are willing to break the law at the expense of other traders who trade honestly.

    4. <u>The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant</u>

To a white-collar defendant, a sentence of probation or home detention, fines, and restitution is the cost of doing business.   A sentence of incarceration would go a long way toward deterring this defendant from committing another crime.   The government believes that if the defendant knew that he would go to jail for his crimes, he never would have engaged in the securities fraud scheme.   That is effective deterrence and that is why a sentence of incarceration is needed here.

Moreover, the defendant's criminal conduct was not a spur-of-the-moment, irrational act. Rather, his decision to buy, sell, and buy Oak Street Health shares and options based on material non-public information was the result of a deliberate, rational calculation: that the benefit of the fraud outweighed the risk of getting caught and being punished.   For this reason, general deterrence is of paramount importance for white-collar offenses.   As explained by the Eleventh Circuit:

Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crimes therefore can be affected and reduced with serious punishment.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (*quoting* Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV. 721, 724 (2005)).

5. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

There is no need to adjust the defendant's sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).

6. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct

Generally, the need to avoid unwarranted sentence disparities weighs in favor of imposing a sentence within the advisory guidelines range.   In fashioning the Sentencing Guidelines, the Sentencing Commission sought not only to achieve consistent sentences for similar white-collar crimes, but also to eliminate disparities in sentencing between white-collar offenses and equally serious non-white-collar offenses.   As former Justice Breyer, an original member of the Sentencing Commission, explained:

The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.   The Commission's statistics indicated that where white collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.   To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider

trading, and antitrust offenders, who previously would have likely received only probation.

*See The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 20 (1988).

Eliminating unwarranted sentencing disparities not only makes the criminal justice system fairer, but it also promotes respect for and faith in the law. *See* 18 U.S.C. § 3553(a)(2)(A). Simply put, when the public sees a defendant who has committed a serious white-collar offense walk away without a commensurate punishment, it fosters the belief that two systems of justice exist: one for the advantaged and one for the disadvantaged. *See United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class.").

    7. <u>The Need to Provide Restitution to Any Victims of the Offense</u>

There are no identifiable victims resulting from the charged offenses. As noted above, the defendant has already paid $100,000 towards the forfeiture amount.

  **D.** **<u>Supervised Release</u>**

Pursuant to USSG §§ 5D1.1 and 5D1.2, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

As reflected in the plea agreement, the defendant's conviction in this case may have immigration consequences, including removal from the United States. Because those immigration consequences are not known at this time, however, the government requests a term of supervised release of at least 2 years. While the defendant does not have a criminal record, the conduct was serious and further supervision after release from custody is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays any remaining forfeiture amounts. This assessment also supports imposition of all the mandatory and standard conditions of supervised release listed in USSG § 5D1.3 in addition to the special condition regarding access to financial information (USSG § 5D1.3(b)(3)(C)), given the Court's forfeiture order.

### III. CONCLUSION

The government's recommendation regarding sentencing appears in the sealed attachment.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Francis A. Weber*
FRANCIS A. WEBER
Assistant United States Attorney

Date:   February 12, 2026

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Sentencing Memorandum was served by ECF and email upon the following defense counsel:

Zak T. Goldstein (ztg@goldsteinmehta.com)

*/s/ Francis A. Weber*
FRANCIS A. WEBER
Assistant United States Attorney

Date:   February 12, 2026